# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PENNY R. PERRY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00056 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | BY: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Penny R. Perry, ("Perry"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Perry protectively filed an application for DIB on January 25, 2010, alleging disability as of January 18, 2010, due to a back injury, hip problems, leg pain, depression, anxiety, bladder problems, left shoulder and arm problems and sleep disorder. (Record, ("R."), at 19, 191, 234.) The claim was denied initially and on reconsideration. (R. at 64-78, 89-93, 94-95, 96-98.) Perry then requested a hearing before an administrative law judge, ("ALJ"), (R. at 103-04), and a video hearing was held on June 14, 2012, at which Perry was represented by counsel. (R. at 36-59.)

By decision dated July 24, 2012, the ALJ found that Perry was disabled beginning on December 8, 2011, but not before. (R. at 19-30.) The ALJ found that Perry met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 21.) The ALJ also found that Perry had not engaged in substantial gainful activity since her alleged onset date. (R. at 21.) The ALJ found that the medical evidence established that, since the alleged onset date, Perry suffered from severe impairments, namely lumbar degenerative disc disease; depression; anxiety; a recent diagnosis of fibromyalgia and arthritis; and borderline intellectual functioning, but she found that Perry did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.) The ALJ found that Perry had the residual functional capacity to perform a range of sedentary

work,[1] which did not require her to stand and/or walk for a total of more than two hours in an eight-hour workday and which did not require her to sit for more than six hours in an eight-hour workday with the option to alternate positions in place every 30 minutes. (R. at 24-28.) The ALJ also found that Perry could not work around hazards or loud background noise. (R. at 24-28.) The ALJ found that Perry was limited to simple, repetitive unskilled work that did not require interaction with the public, more than occasional postural activities or more than occasional operation of foot controls. (R. at 24-28.) The ALJ found that Perry was unable to perform any of her past relevant work. (R. at 28.) Based on Perry's age, education, work history and residual functional capacity and the Medical-Vocational Guidelines, ("Grids"), found at Part 404, Subpart P, Appendix No. 2, the ALJ found that, beginning December 8, 2011, Perry was disabled. (R. at 29.) Based on Perry's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that jobs existed in significant numbers in the national economy that Perry could perform, including jobs as a work addresser, a dowel inspector and a table worker, prior to this date. (R. at 28-29.) Thus, the ALJ found that Perry was disabled as of December 8, 2011, and eligible for benefits starting this date, but not before this date. *See* 20 C.F.R. § 404.1520(g) (2014).

After the ALJ issued her decision, Perry pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 1-5.) Perry then filed this action seeking review of the ALJ's partially unfavorable decision,

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2014).

which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on Perry's motion for summary judgment filed May 7, 2014, and the Commissioner's motion for summary judgment filed June 9, 2014.

## *II. Facts*

Perry was born in 1962, (R. at 39), which classified her as a "younger person" under 20 C.F.R. § 404.1563(c), until April 2012. After April 2012, Perry was classified as a person "closely approaching advanced age" under 20 C.F.R. § 404.1563(d). She has a high school education and past relevant work experience working in an auto repair shop and as a dental assistant. (R. at 40-42.) Perry testified at her hearing that she could walk and/or stand one or two hours in an eight-hour workday and sit for about 15 to 20 minutes before changing positions. (R. at 44.) Perry stated that she felt tired all of the time and did not feel like "doing anything or going anywhere." (R. at 45.) She said that she would "get real nervous and real anxious." (R. at 45.)

Barry Williams, a vocational expert, also was present and testified at Perry's hearing. (R. at 51-57.) Williams classified Perry's past work as a supervisor in an auto body shop as light[2] and skilled work and as a dental assistant as light and skilled. (R. at 52.) Williams testified that a hypothetical individual of Perry's age, education and work history, who could frequently lift items weighing up to 10 pounds and occasionally lift items weighing up to 20 pounds, could stand and walk no more than two hours and sit for no more than six hours in an eight-hour

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2014).

-4-

workday with postural changes every 30 minutes without leaving the work place, occasionally work foot controls, climb ramps or stairs, balance, kneel, crawl, stoop and crouch, should avoid concentrated exposure to extreme cold temperatures, cannot work around hazardous machinery and unprotected heights, cannot climb ladders, ropes scaffolds or work on vibrating surfaces and can perform only simple, routine, repetitive, unskilled work with limited contact with co-workers and supervisors in a low-stress environment with no strict production demands, no excessively loud background noise and no interaction with the general public, could perform work as a addresser, a dowel inspector and a table worker. (R. at 53-55.) Williams also testified that if an employee missed two or more days of work a month, there would be no jobs she could perform. (R. at 58.)

In rendering his decision, the ALJ reviewed medical records from Norton Community Hospital; Dr. Kevin Blackwell, D.O.; The Regional Rehab Center; Highlands Neurosurgery, P.C.; Wellmont Lonesome Pine Hospital; Dr. Michael Ford, M.D.; Elizabeth A. Jones, M.A; state agency psychologist Maurice Prout, Ph.D.; state agency physician Dr. Joyce Goldsmith, M.D.; Dr. Nicanor B. Concepcion, M.D.; psychologist B. Wayne Lanthorn, Ph.D.; Dr. Thomas F. Scott, M.D.; Gary Bennett, Ph.D.; Appalachia Medical Clinic; and Dr. Rodolfo Cartegena, M.D..

Perry saw Dr. Kevin Blackwell, D.O., at OccuMed Health Center on November 17, 2009, complaining of back pain after tripping over a water hose and falling the previous day. (R. at 303, 305-08.) Perry said her pain was mostly in the lower buttocks region. (R. at 303.) Dr. Blackwell noted that Perry did not appear in any acute distress, but he noted that she was tender in the lumbar musculature with

no spasm noted. (R. at 303.) Dr. Blackwell also stated that Perry's gait was symmetrical and balanced, her spine revealed no obvious deformities or abnormal curvatures, her upper and lower joint examinations were unremarkable, and upper and lower extremities were normal for size, shape, symmetry and strength. (R. at 303.) No atrophy was noted, and straight leg raise examination was negative for below the knee pain. (R. at 303.) Dr. Blackwell ordered x-rays and physical therapy and gave Perry prescriptions for Ultracet and Soma. (R. at 303.) Dr. Blackwell's note stated that Perry was taking Prozac. (R. at 308.) Dr. Blackwell stated that Perry could return to work with no lifting of items weighing more than 15 pounds, no pushing or pulling and alternating sitting, standing and walking as needed. (R. at 308.)

X-rays of Perry's lumbar spine taken on November 17, 2009, showed lumbar degenerative changes with no evidence of compression fracture or spondylolisthesis. (R. at 289.) X-rays of Perry's sacrum taken the same day revealed an irregularity in the upper one-third of the sacrum. (R. at 290.)

Dr. Blackwell saw Perry again on November 24, 2009. (R. at 301, 309.) On this date, Perry complained of lower back and right leg pain. (R. at 309.) Perry rated her pain level at a 7-8 on a 10-point scale. (R. at 301.) Dr. Blackwell's examination found no loss of strength and no spasms. (R. at 301.) Dr. Blackwell noted that Perry did not appear to be in an "acute distress." (R. at 301.) He noted that Perry was tender in the lumbar musculature; otherwise his exam was unremarkable with no abnormal findings. (R. at 301.) Dr. Blackwell ordered an MRI of her lumbosacral spine. (R. at 301, 309.) Dr. Blackwell also stated that Perry could return to work. (R. at 309.)

-6-

An MRI of Perry's lumbar spine performed on January 4, 2010, revealed degenerative changes with spur formation, disc space narrowing and facet arthropathy. (R. at 291.) The MRI revealed disc bulging at multiple levels, with the most prominent at the L4-5 and L5-S1 levels. (R. at 291.) The radiologist's report noted neural foraminal narrowing at these levels with contact of the exiting nerve root at the L4-5 level. (R. at 291.)

Dr. Blackwell saw Perry again on January 11, 2010, for follow up for low back pain and right leg pain. (R. at 298, 306.) Perry's examination, again, revealed benign findings other than some tenderness in her lumbar musculature. (R. at 298.) Dr. Blackwell recommended a neurosurgical second opinion. (R. at 298.) He prescribed Lortab and Soma. (R. at 298.) Dr. Blackwell stated that Perry was able to return to work, but he stated she was restricted to "limited activities." (R. at 298, 306.)

Perry reported a fall at work to her primary care physician, Dr. Michael Ford, M.D., on November 23, 2009. (R. at 477.) Perry's musculoskeletal and neurological exams revealed no weakness, intact joints and reflexes and a normal gait. (R. at 477.) The record contains a note from Dr. Ford written on a prescription pad dated April 27, 2010, and stating: "[patient] has MRI and it was [positive] for L4-5 bulged disc and effacement of nerve sac [positive] … bilat. Same at L5-S1 – date 1/4/10 – this cannot resolve on its own that short time frame and no followup MRI has been done. Back to work without MRI or [nerve conduction studies] or ortho opinion is wrong." (R. at 472.) The note also states that Perry was not seen on this date; her last visit was February 18, 2010. (R. at 472.) A musculoskeletal exam performed by Dr. Ford on June 24, 2010, revealed no atrophy or weakness,

intact joints and a normal gait. (R. at 471.) Despite these benign medical findings, Dr. Ford completed a Medical Source Statement – Physical form on June 25, 2010, stating that Perry could lift items weighing 20 pounds or less occasionally and less than 10 pounds frequently. (R. at 413-14.) Dr. Ford also stated that Perry could not work an eight-hour workday. (R. at 413.) The form did not include any medical findings to support Dr. Ford's assessment. (R. at 413-14.) The form stated the prognosis of "without surgery … progressive deterioration[,]" but did not indicate what type of surgery was necessary. (R. at 414.)

Perry was seen at the Lonesome Pine Hospital Emergency Department on January 18, 2010, for back pain. (R. at 394-95.) Perry stated that she had hurt her back at work in November and then bent over to lift and felt a pain in her lower back again. (R. at 394.) The report stated that Perry had Lortab at home and had an appointment to see a neurosurgeon. (R. at 394-95.) The report stated that Perry did not want a shot for pain. (R. at 394.) Perry was given an additional prescription for Lortab. (R. at 400.)

Perry saw Dr. J. Travis Burt, M.D., with Highlands Neurosurgery, P.C., on January 27, 2010. (R. at 387-88.) Perry complained of back pain after tripping and falling at work. (R. at 387.) She told Dr. Burt that she reinjured her back on January 18, 2010, lifting at work. (R. at 387.) Perry also complained of right side hip pain and tingling in her right leg. (R. at 387.) Perry stated that she also suffered from depression and anxiety. (R. at 387.) Dr. Burt noted that palpation of Perry's back produced no specific areas of tenderness, and he found no spasm. (R. at 387.) Patrick's maneuver and straight leg raises were unremarkable. (R. at 387.) Sensory examination by pinprick and strength were intact. (R. at 387.) Dr. Burt stated that

-8-

review of Perry's previous MRI revealed age-related degenerative changes of the lumbar spine with no evidence of disc herniation. (R. at 387.) Dr. Burt concluded: "Examination is fairly normal. Her complaints appear to be subjective in nature." (R. at 387.) Dr. Burt ordered a bone scan and electromyography, ("EMG"), of Perry's right lower extremity. (R. at 388.) Dr. Burt wrote Perry an excuse from work from January 27, 2010, until February 9, 2010, pending her tests results, but he did not list any specific findings or any specific restrictions on her activities. (R. at 386.)

Perry returned to see Dr. Burt on February 9, 2010. (R. at 380.) Dr. Burt noted that Perry's bone scan and EMG/nerve conduction study results were normal. (R. at 380.) Dr. Burt stated that the physician who performed these tests noted that Perry had extremely poor pain tolerance. (R. at 380.) Dr. Burt ordered a return to physical therapy and prescribed Vicodin and Robaxin. (R. at 380.) Dr. Burt again excused Perry from work until her return to his office on March 2, 2010, "due to therapy," but he listed no findings or restrictions on her work-related activities. (R. at 381.)

A February 15, 2010, report from The Regional Rehab Center at Norton Community Hospital stated that Perry reported for a second round of therapy complaining of pain in her low back and right hip and leg. (R. at 346-47.) Perry stated that, if she attempted to bend, her back would give out and she would fall to the ground. (R. at 346.) Perry also complained of numbness and tingling down her leg. (R. at 346.) Straight leg raise on the right side was positive for hip pain at 45 degrees of hip flexion. (R. at 347.) Palpation revealed some tenderness in Perry's lumbar spine/sacrum area. (R. at 347.)

When Perry returned to see Dr. Burt on March 2, 2010, she stated that she had not "gained significant benefit from her therapy." (R. at 377.) Dr. Burt noted that Perry's examination showed that she was neurologically intact with no limitation in her range of motion. (R. at 377.) Dr. Burt stated: "I have discussed with [Perry] that presently given that her studies are all normal we can either return her to work or continue to pursue a work conditioning program. She does not wish to work presently and would rather be enrolled in a work hardening program." (R. at 377.) Dr. Burt again wrote Perry an excuse from work until March 17, 2010, to complete work hardening. (R. at 378.)

Perry saw Dr. Burt again on March 17, 2010. (R. at 375.) Dr. Burt noted that Perry had participated in work hardening and seemed to be doing quite well until just a day or two before her return office visit when she complained of re-exacerbation of her pain. (R. at 375.) Dr. Burt stated that his examination of Perry was normal and that he was "at a loss to objectively explain her subjective complaints." (R. at 375.) Dr. Burt also stated:

> At present time I have no identifiable reason to restrict her work activities. Therefore … I will release … Perry to return to work with no restrictions. She is currently at maximum medical improvement with a 0% medical impairment rating.

(R. at 375.)

Perry again saw Dr. Burt on April 27, 2010. (R. at 373.) Dr. Burt noted that Perry stated that she had not resumed all of her preinjury job duties. (R. at 373.) Dr. Burt stated that he told Perry that it was in her best interest to increase her activities and continue with movement. (R. at 373.) He also stated that Perry could

-10-

continue her preinjury job habits. (R. at 373.)

Perry returned to the Lonesome Pine Hospital Emergency Department on June 3, 2010, complaining of increased back pain that was worse when walking or standing. (R. at 405.) Lumbosacral spine x-rays taken that day showed degenerative disc disease at multiple levels. (R. at 407.)

Elizabeth A. Jones, M.A., with Frontier Health Assessment and Forensic Services, performed a mental status examination of Perry on July 28, 2010. (R. at 422-27.) Jones noted that Perry's grooming and hygiene were appropriate, and her affect was mildly blunted with congruent mood. (R. at 422.) Jones noted that Perry walked and rose from a seated position slowly. (R. at 422.) Perry told Jones that she was applying for DIB because "I have a sciatic nerve and bulging disc and nerve problem. … I've had back pain since November and have to limit myself." (R. at 423.) Perry told Jones that physical therapy was not helpful and that she would consider surgery if it would assist in controlling her pain. (R. at 423.) Perry said that she took one Lortab 5-500 every four to six hours, but she did not take a prescribed muscle relaxer. (R. at 423.)

Perry told Jones that she also took Serax and Prozac daily due to depression and anxiety. (R. at 423.) Perry stated that all her sisters took anti-depressant and anti-anxiety medication. (R. at 423.) She said that she had good days and bad days and that the medicine helped some days. (R. at 423.) Perry stated that she had never been involved in any psychological counseling, nor had she ever been psychiatrically hospitalized. (R. at 423.) Jones stated that Perry did not appear to have significant memory problems and had no difficulty with attention and

concentration. (R. at 424.) Jones noted no evidence of psychomotor agitation or retardation. (R. at 424.) Perry denied both hallucinations and delusions, and Jones found no evidence of any disordered thought processes. (R. at 424.) Jones stated that Perry appeared to be functioning in the average range of intelligence. (R. at 425.)

Perry stated that she has had problems with depression since the death of her father when she was 26 years old. (R. at 425.) She said her father died in his sleep and, after that, she was afraid to go to sleep. (R. at 425.) Perry also claimed she was traumatized when her brother shot her in the chest when she was 15 years old. (R. at 425.) She also complained of insomnia since her husband died six years earlier. (R. at 425.) Perry stated that her appetite "comes and goes," and her energy level was low. (R. at 425.) Perry complained of panic attacks and worrying all the time. (R. at 425.) She said, "I get real shaky and I sweat. I'm on edge all the time. It's like I'm spastic." (R. at 425.) Jones stated that Perry had no difficulty relating to her and would have no difficulty relating to others. (R. at 425.)

As a result of her evaluation, Jones stated:

> … Perry does not appear to be limited in her ability to understand and remember and should be able to understand both simple and detailed instructions. Due to moderate anxiety and depression, however, she does appear to have mild limitations in her ability to sustain concentration and persistence and may have difficulty making work-related decisions. She is, however, capable of working in proximity to others. Mild limitations appear to exist in her social interaction, again, due to self-reported isolation. She does, however, maintain socially[]appropriate behavior and basic standards of neatness and cleanliness. She is not limited in her adaptation and she is capable of traveling independently and is responsible for the finances in the

-12-

home.   She is aware of normal hazards and takes appropriate precautions.

(R. at 426.)   Jones diagnosed Perry with an anxiety disorder, not otherwise specified, with mixed anxiety and depressed mood. (R. at 426.) Jones placed Perry's then-current Global Assessment of Functioning,[3] ("GAF"), score at 65.[4] (R. at 427.) Jones's report also was signed by Diane L. Whitehead, Ph.D., a licensed clinical psychologist. (R. at 427.)

Maurice Prout, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on August 9, 2010. (R. at 431-41.) Prout stated that Perry had an anxiety-related disorder which was not severe and did not meet the criteria for the listed impairment found at Part 404, Subpart 1, Appendix 1, § 12.06. (R. at 431, 435.) He opined that Perry was mildly restricted in her activities of daily living, experienced no difficulties in maintaining social functioning, experienced mild difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 439.) Prout had reviewed Jones's report of her mental evaluation. (R. at 441.)

On August 4, 2010, Dr. Ford wrote a letter stating:

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[4] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

> … Perry has been a patient of mine for numerous years. She had one MRI done on January 4, 2010, and it was positive for L4-L5 bulging disc and effacement of nerve sac bilateral. Same at L5-S1. This cannot resolve on its [own] in that short time frame. No follow up MRI has been done.
>
> If … Perry was to go back to work without another MRI or Nerve Conduction Study or another opinion it would be detrimental to her health.

(R. at 468.) Perry saw Dr. Ford again on August 6, 2010. (R. at 467.) While much of Dr. Ford's notes are not legible, it does appear that he prescribed Lortab 5/500 to be taken every four to six hours for back and leg pain. (R. at 467.)

Perry returned to Dr. Blackwell for a consultative examination at the state agency's request on October 10, 2010. (R. at 442-46.) Perry complained of constant pain in her back radiating into her right leg with burning and tingling at times and pain in both hips. (R. at 442.) She stated that the pain was worse with activity and that she could not walk much. (R. at 442.) Perry said that her pain level was usually an 8 to 9 on a 10-point scale. (R. at 442.) Perry also complained of insomnia. (R. at 442.)

Dr. Blackwell noted that Perry was alert, cooperative and oriented with good mental status and did not appear in any acute distress. (R. at 443.) Perry's gait was symmetrical and balanced, there was no swelling or obvious deformity in her joints, and her upper and lower extremities were normal for size, shape, symmetry and strength. (R. at 443.) All of Perry's ranges of motion were within normal limits. (R. at 446.) Dr. Blackwell stated that, based on his examination, Perry should be able to sit for six hours and stand for two hours with normal positional changes in an eight-hour workday. (R. at 444.) Dr. Blackwell stated that Perry

could operate a motor vehicle for one-third of a workday, bend and kneel for one-third of a workday, reach above her head for one-third of a workday and operate foot pedals for one-third of a workday. (R. at 444.) He stated that Perry should avoid squatting, stooping, crouching, crawling and unprotected heights. (R. at 444.) He stated that Perry could occasionally lift items weighing up to 35 pounds and frequently lift items weighing up to 15 pounds. (R. at 444.)

Dr. Joyce Goldsmith, M.D., a state agency physician, completed a Physical Residual Capacity Assessment on Perry on October 27, 2010. (R. at 449-55.) Dr. Goldsmith stated that, based on her review of the medical evidence of record, Perry could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 450.) She stated that Perry could stand and walk with normal breaks at least two hours in an eight-hour workday and sit about six hours in and eight-hour workday. (R. at 450.) She did state that Perry's ability to push and pull was limited in her lower extremities. (R. at 450.) Dr. Goldsmith stated that Perry could occasionally climb ramps and stairs, balance, stoop, kneel and crouch, but she should never climb ladders, ropes or scaffolds or crawl. (R. at 452.) Dr. Goldsmith stated that Perry also should avoid even moderate exposure to hazards such as machinery or heights. (R. at 453.)

Dr. Ford completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) form on November 23, 2011, stating that Perry had unsatisfactory work performance or no useful ability to make all occupational, performance and personal/social adjustments other than a good ability to maintain personal appearance. (R. at 515-17.) Dr. Ford stated that these limitations were based upon medical findings of anxiety, depression, fibromyalgia, spine

-15-

neuropathy, arthritis, stress, limited mobility and endurance, chronic obstructive pulmonary disease and sleep apnea. (R. at 515-17.) Dr. Ford stated that Perry required frequent rests and to move or walk periodically to relieve pain. (R. at 517.) He also stated that crowds or "work place" stress would exacerbate her depression and anxiety. (R. at 517.) Dr. Ford stated that Perry would miss more than two days of work a month based on her impairments or treatment. (R. at 517.)

Dr. Ford also completed an Assessment Of Ability To Do Work-Related Activities (Physical) form on November 23, 2011. (R. at 519-21.) On this form, Dr. Ford stated that Perry could frequently lift and carry items weighing up to 10 pounds. (R. at 519.) He stated that Perry could stand or walk for up to two hours in an eight-hour workday and stand or walk for up to one hour without interruption. (R. at 519.) Dr. Ford stated that Perry could sit for up to two hours in an eight-hour workday and sit for up to 30 minutes without interruption. (R. at 520.) He stated that Perry could occasionally stoop, kneel and balance, but never climb, crouch or crawl. (R. at 520.) Dr. Ford also stated that Perry should not work around heights, moving machinery, temperature extremes, noise, humidity or vibration. (R. at 521.) Dr. Ford stated that these restrictions were based upon diagnoses of fibromyalgia, arthritis and cervical spine neuropathy. (R.at 520.) He stated that "all work related activities are essentially affected by … diagnosis and anxiety, depression & stress." (R. at 521.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a psychological evaluation on Perry at the request of her counsel on January 4, 2012. (R. at 523-36.) Perry denied any previous psychiatric or psychological intervention other than one previous visit to one mental health professional. (R. at 525-26.)

-16-

Perry stated that she injured her back at work in 2009 and suffered from pain in the lumbar region of her spine running down her right leg to her toes. (R. at 526.) She stated that on a "bad day" her pain level was an 8/9 on a 10-point scale, on a "not so bad day," her pain level was a 7/8. (R. at 526.) Perry told Lanthorn that she took Lortab three to four times a day as needed, as well as Prozac, Serax and Motrin. (R. at 526.)

Perry told Lanthorn that she did not "do much" on a daily basis. (R. at 527.) She said that she did very little cooking or cleaning, does not do the grocery shopping or go to church. (R. at 527.) She said that she primarily socialized with her daughter and family members, watched some television and would occasionally read. (R. at 527.) Lanthorn noted that Perry walked without any difficulties of gait. (R. at 527.)

Lanthorn noted that Perry made good eye contact, her affect was somewhat mixed, and she showed some signs of anxiety. (R. at 527.) He noted that when Perry became tense or nervous, her performance dropped significantly. (R. at 527.) Perry's concentration and persistence at tasks was "generally fairly good." (R. at 527.) She exhibited no clinical signs or indicators of ongoing psychotic processes or of delusional thinking, and she denied ever having hallucinations of any type. (R. at 527.) Perry told Lanthorn that she first became depressed "years ago" after the death of her father. (R. at 527.) She stated that her anti-depressant medication was of some help, but she remained quire irritable and rather moody. (R. at 527.) Perry stated that she had occasional suicidal ideations, but no plans or intent. (R. at 527.) She denied any homicidal ideation, plans to intent. (R. at 528.) Perry stated that she cried at times, and she complained of lack of energy and feeling worthless and useless. (R. at 528.) Perry stated that her memory was "pretty good," but her

concentration was erratic at times. (R. at 528.)

Perry reported that she became so anxious at times that she "can't control it." (R. at 528.) Perry also reported suffering from panic attacks two to three times a month, during which she becomes very anxious, fearful, her heart races, she feels like she is having a heart attack, she becomes weak and nauseated, and she experiences a choking sensation, as well as shortness of breath. (R. at 528.) Perry stated that she often felt on edge, tense, jittery, fidgety and restless. (R. at 528.) She stated that she no longer handled stress well. (R. at 528.)

Perry was able to recall five out of five words presented to her 10 minutes earlier. (R. at 528.) She correctly performed serial 7s with only one error. (R. at 528.) She gave correct interpretations to three out of three common adages. (R. at 528.) She could spell world forward, but not backward. (R. at 528.)

Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Perry attained a verbal comprehension index score of 74, a perceptual reasoning index score of 75, a working memory index score of 83, a processing speed index score of 86 and a full-scale IQ score of 74. (R. at 529.) Lanthorn stated that Perry gave a good effort, and he believed her test results were valid and accurately reflected her current degree of functioning. (R. at 528.) He also stated that her full-scale IQ score placed Perry in the borderline rage of intellectual functioning. (R. at 529.)

Lanthorn also administered the Minnesota Multiphasic Personality Inventory – 2 test, ("MMPI-2"). (R. at 530-32.) Lanthorn stated that the MMPI-2 results

generated a valid profile which showed that Perry was openly acknowledging significant psychological distress. (R. at 530.) Lanthorn also stated that the MMPI-2 results showed that Perry felt depressed, unhappy, pessimistic about the future, inadequate, helpless, lacking in self-confidence, worried, tense, anxious and experiencing significant emotional difficulties. (R. at 531.) Lanthorn stated, "Her level of depression directly contributes to social withdrawal, poor concentration, as well as disruption of both sleep and appetite functions. She is likely to have a low frustration tolerance." (R. at 531.) According to Lanthorn, Perry also was likely to often be irritable, impatient, grouchy and prone to overreact to minor stress with agitation, guilt and self-punishment. (R. at 531.) Lanthorn also stated that Perry was having difficulty with concentration and keeping her mind on a task or a job. (R. at 531.)

Lanthorn diagnosed Perry as suffering from a mood disorder with major depressive-like episode, moderate to severe, due to chronic physical problems, pain and limitations; a pain disorder with both psychological factors and general medical condition, chronic; an anxiety disorder with both panic attacks and generalized anxiety due to chronic physical problems; and borderline intellectual functioning. (R. at 532.) He placed Perry's then-current GAF score at 50,[5] and he stated that her allegations of psychologically disabling conditions were fully credible. (R. at 532.) According to Lanthorn:

> The results of this psychological evaluation reveal a middle-age woman who is functioning in the Borderline Range intellectually. During our time together, she displayed no real difficulties with

---

[5] A GAF score of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

-19-

immediate or short-term memory or long-term memory. During the testing phase, she focused her concentration and persisted at tasks reasonably well. She appears to have significant psychological difficulties secondary to an injury she experienced in 2006. … She has become socially withdrawn. She often feels worthless, useless, cries frequently, has little to no energy, is experiencing anhedonia and dysphoria, etc. She has panic attacks two to three time per month and has ongoing generalized anxiety. She is prone to worry a great deal. She is very pessimistic about her own future. She has disrupted sleep patterns and appetite functions. Her communication skills are intact. It is felt that … Perry's psychological condition is such that it would impede her sustaining gainful employment.

(R. at 533.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Perry on January 4, 2012. (R. at 534-36.) On this Assessment, Lanthorn stated that Perry had seriously limited or no useful ability to function in all areas of occupational, performance and personal/social adjustment with the exception of an unlimited ability to understand, remember and carry out simple job instructions. (R. at 534-36.) Lanthorn stated that, on average, Perry would miss more than two days a month from work due to her impairments and/or treatment. (R. at 536.)

In a letter dated May 1, 2012, Lanthorn stated that, based on his January 4, 2012, evaluation of Perry, he believed her condition met or equaled the listed impairments found at § 12.04(A)(1) and § 12.06. (R. at 583-84.) Lanthorn stated that, even though Perry was taking anti-depressant medication, she remained significantly depressed. (R. at 583.)

-20-

Dr. Thomas F. Scott, M.D., an orthopedic surgeon, completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) on March 22, 2012. (R. at 540-45.) Dr. Scott stated that Perry could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 540.) He stated that Perry could sit for up to six hours at a time and stand for up to two hours at a time in an eight-hour workday. (R. at 541.) Dr. Scott stated that Perry could occasionally (up to one-third of the time) reach overhead with both hands and could frequently reach, handle, finger, feel and push/pull. (R. at 542.) He stated that Perry could occasionally operate foot controls, climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 542-43.) He also stated that Perry could occasionally work around unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme temperatures and vibrations and operate a motor vehicle. (R. at 544.) He stated that Perry should not perform repeated bending, lifting or stooping. (R. at 545.)

Gary Bennett, Ph.D., a licensed clinical psychologist, completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on Perry on March 27, 2012. (R. at 552-54.) Bennett stated that despite suffering from anxiety, depression and borderline intellectual functioning, Perry had a satisfactory or better ability to function in all activity areas. (R. at 552-53.) Bennett stated that there was no evidence of record to establish any onset date for Perry's psychological issues. (R. at 553.)

Perry saw Dr. Ford again on March 12, 2012, complaining of no energy and frequently feeling exhausted at the end of the day. (R. at 592.) Dr. Ford diagnosed

Perry as suffering from attention deficit/hyperactivity disorder and prescribed Adderal. (R. at 592.)  On May 3, 2012, Perry stated that she was feeling much better on Adderal. (R. at 590.) Perry stated that she could function and accomplish tasks much better, and she was sleeping well at night. (R. at 590.)

On May 30, 2012, Dr. Rodolfo Cartegena, M.D., completed an Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 600-02.) Dr. Cartegena stated that Perry could frequently lift and carry items weighing up to 10 pounds. (R. at 600.) He stated that Perry could stand and walk only up to two hours total and for up to one hour at a time and sit only up to one hour total and up to 20 minutes at a time in an eight-hour workday. (R. at 600-01.) Dr. Cartegena stated that Perry could never climb, crouch or crawl, but could occasionally stoop, kneel and balance. (R. at 601.)  He stated that Perry would be absent more than two days a month due to her impairments and treatment. (R. at 602.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if she sufficiently explains her rationale and if the record supports her findings.

Perry argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) More specifically, Perry argues that the ALJ erred by giving little weight to the opinions of Dr. Ford and Dr. Cartegena that Perry was incapable of performing an eight-hour workday at any level of exertion. Perry also argues that the ALJ erred by failing to give full

-23-

consideration to Lanthorn's opinion as to the severity of Perry's mental impairments and the resulting effect on her work-related abilities. (Plaintiff's Brief at 7-9.)

After a review of the evidence of record, I find Perry's arguments unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of Dr. Ford, Dr. Cartegena and Lanthorn. The ALJ specifically stated that he was giving little weight to the opinions of Dr. Ford and Dr. Cartengena and no weight to the opinions of Lanthorn. (R. at 26-28.) The ALJ's decision to give little weight to Dr. Ford's opinions is supported by the opinions of Perry's treating neurosurgeon, Dr. Burt. Dr. Burt's records show that over his course of treatment from January 27 to April 27, 2010, his findings were essentially normal except for age-related changes

in Perry's spine. Dr. Burt noted that palpation of Perry's back produced no specific areas of tenderness, and he found no spasm. (R. at 387.) Patrick's maneuver and straight leg raises were unremarkable. (R. at 387.) Sensory examination by pinprick and strength were intact. (R. at 387.) Dr. Burt noted that Perry's bone scan and EMG/nerve conduction study results were normal. (R. at 380.) Dr. Burt noted that Perry's examination showed that she was neurologically intact with no limitation in her range of motion. (R. at 377.) In the end, Dr. Burt stated that his examination of Perry was normal and that he was "at a loss to objectively explain her subjective complaints." (R. at 375.) Dr. Burt also stated:

> At present time I have no identifiable reason to restrict her work activities. Therefore … I will release … Perry to return to work with no restrictions. She is currently at maximum medical improvement with a 0% medical impairment rating.

(R. at 375.)

I also find that the ALJ's decision to give no weight to the opinions of Lanthorn is supported by substantial evidence. It is important to note that Lanthorn's evaluation of Perry occurred on January 4, 2012, after the ALJ found that she was disabled. Nothing in Lanthorn's report addresses Perry's mental condition prior to December 8, 2011, the date the ALJ found that she became disabled. The only mental health professional to evaluate Perry prior to this date was Elizabeth A. Jones, M.A., with Frontier Health Assessment and Forensic Services, who performed a mental status examination of Perry on July 28, 2010. (R. at 422-27.) As a result of her evaluation, Jones stated that Perry did not appear to have significant memory problems and had no difficulty with attention and concentration. (R. at 424.) Jones noted no evidence of psychomotor agitation or

retardation. (R. at 424.) Jones found no evidence of any disordered thought processes. (R. at 424.) Jones stated that Perry appeared to be functioning in the average range of intelligence. (R. at 425.) Jones stated that Perry had no difficulty relating to her and would have no difficulty relating to others. (R. at 425.)

As a result of her evaluation, Jones stated:

> … Perry does not appear to be limited in her ability to understand and remember and should be able to understand both simple and detailed instructions. Due to moderate anxiety and depression, however, she does appear to have mild limitations in her ability to sustain concentration and persistence and may have difficulty making work-related decisions. She is, however, capable of working in proximity to others. Mild limitations appear to exist in her social interaction, again, due to self-reported isolation. She does, however, maintain socially[]appropriate behavior and basic standards of neatness and cleanliness.  She is not limited in her adaptation and she is capable of traveling independently and is responsible for the finances in the home.  She is aware of normal hazards and takes appropriate precautions.

(R. at 426.)  Jones placed Perry's then-current GAF score at 65, which reflects only mild psychological symptoms. (R. at 427.)

The ALJ's decision to give no weight to Lanthorn's opinions also is supported by the PRTF completed by state agency psychologist Prout on August 9, 2010. (R. at 431-41.) Prout stated that Perry had an anxiety-related disorder which was not severe and did not meet the criteria for the listed impairment found at Part 404, Subpart 1, Appendix 1, § 12.06. (R. at 431, 435.) He opined that Perry was mildly restricted in her activities of daily living, experienced no difficulties in maintaining social functioning, experienced mild difficulties in maintaining

concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 439.) Prout had reviewed Jones's report of her mental evaluation. (R. at 441.)

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's decision to accord little weight to the opinions of Dr. Ford and Dr. Cartegena and no weight to the opinions of Lanthorn. I further find that the evidence cited above provides substantial evidence supporting the ALJ's finding as to Perry's residual functional capacity and her finding that Perry was not disabled prior to December 8, 2011. An appropriate order and judgment will be entered.

ENTERED: March 26, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE